## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ERIC MURDOCK,** | : | **No. 1:20-cv-02138** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Judge Rambo)** |
| | : | |
| **GENE BROWN, <u>et al.</u>,** | : | |
| **Defendants.** | : | |

## <u>MEMORANDUM</u>

Before the Court for resolution is the issue of whether the remaining Defendants—<u>i.e.</u>, C.O. Rosse ("Rosse"), C.O. Terra ("Terra"), and Lt. Rininger[1]— have met their burden to establish the affirmative defense of pro se Plaintiff Eric Murdock ("Murdock")'s failure to exhaust administrative remedies in accordance with the Prison Litigation Reform Act ("PLRA") before commencing this action in federal court.  As explained further below, the Court finds that Defendants have met their burden to prove that Murdock failed to exhaust his administrative remedies.  Accordingly, the Court will enter judgment in their favor and against Murdock.

---

[1]  Murdock incorrectly spelled the last name of this Defendant as "Rinnger" in the complaint.  (Doc. 1 at 2.)  The Court will refer to the correct spelling, <u>i.e.</u>, "Rininger," in this Memorandum.

## I.      BACKGROUND

Murdock commenced this action by filing a complaint against Defendants Gene Brown ("Brown"), Rosse, Terra, Lt. Rininger, P.S.S.[2] Dunn ("Dunn"), Superintendent Robert Marsh ("Supt. Marsh"), and the Pennsylvania Department of Corrections ("DOC") on November 10, 2020.  (Doc. 1.)  In the complaint, Murdock asserted the following claims against Defendants in their official and individual capacities: (1) claims under 42 U.S.C. § 1983 for violations of his rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution (including claims under Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978)); (2) claims for violations of Article I of the Pennsylvania Constitution; and (3) claims under Pennsylvania law relating to a failure to protect and intervene.  (Id. at 4, 17–23.)  Murdock sought monetary damages as well as injunctive and mandamus relief.  (Id. at 19, 23.)

Regarding his factual allegations, Murdock alleged that he and Brown were incarcerated at Pennsylvania State Correctional Institution Benner ("SCI Benner") in late February 2020.  (Id. ¶¶ 7–8, 21, 23.)  On February 28, 2020, Brown was in a cell on "J-block," where Rosse was working.  (Id. ¶¶ 16, 22.)  At this time, Rosse was aware that Brown had a mental disability, a "D-code" classification, and a

---

[2]  Murdock appears to use "P.S.S." as an abbreviation for "Psychiatrist Social Service Liaison."  (Doc. 1 ¶ 25.)

history of violent behavior.[3]  (Id. ¶ 18.)  Brown's violent history included

victimizing vulnerable inmates on J-block and assaulting cellmates.  (Id. ¶ 19.)

While in his cell, Brown "vociferously expressed" his desire to be released

from his cell on J-block after completing his sanctioned time there.  (Id. ¶ 21.)  He

also warned Rosse, Terra, and Lt. Rininger about placing anyone else in his cell

because if they did, "there w[ould] be a problem."  (Id. ¶¶ 22, 27 (emphasis

omitted)).  Despite this warning, Murdock was placed into Brown's cell at

approximately 1:30 p.m. after receiving a thirty (30)-day sanction for having a

"dirty urine."[4] (Id. ¶ 28.)

Prior to Murdock's placement into Brown's cell, Dunn conducted a

psychological evaluation of Murdock in accordance with SCI Benner/DOC

procedures.  (Id. ¶ 25.)  Dunn's evaluation led her to believe that Murdock should

be placed into Brown's cell.  (Id. ¶ 26.)  Murdock asserts that his placement into

Brown's cell shows that the SCI Benner/DOC evaluation procedure was flawed.

(Id.)

---

[3]  The Court infers from the complaint that "D-Code" is a housing classification
given to incarcerated individuals with mental illnesses.

[4]  Murdock alleges that he "does not have a violent past, [wa]s not incarcerated for
a violent crime, [and] has never been placed in solitary confinement for any jail-
house [sic] infractions."  (Doc. 1 ¶ 24.)

Upon Murdock's entry into Brown's cell, Murdock "was immediately overwhelmed by the strong smell of urine and the sight of feces smeared all over the walls." (Id. ¶ 29.)  Over the course of the next three days, Murdock observed Brown's "dangerous" and "psychotic" behavior, including Brown "pac[ing] the floor of the locked cell[] for five, six hours at a time, while spewing loud, profanity-laced tirades at the wall, floors, and door." (Id. ¶¶ 30, 31.)  Brown also would stand with his back to the door and "psychotically star[e]" at Murdock for hours at a time and without speaking to him. (Id. ¶ 32.)

On March 2, 2020, Rosse and Terra escorted Murdock from the cell so he could get a shower. (Id. ¶ 33.)  On the way to the showers, Murdock told Rosse and Terra that he feared for his life because Brown's "unstable mental condition posed an unnecessary threat to his safety." (Id. ¶¶ 33, 35.)  Murdock also told them that "he should not have to handle violent, unstable[] psychopaths." (Id. ¶ 36.)  Due to Brown's behavior, Murdock asked Rosse and Terra to be immediately removed from Brown's cell. (Id. ¶ 33.)  Rosse told Murdock, inter alia, he would not be moved and pointed out that Murdock was a "big-boy," he and Brown were "about the same size," and he could "handle [him]self." (Id. ¶ 34.)

The following day, Rosse approached Brown and Murdock's cell and started to antagonize and upset Brown. (Id. ¶ 38.)  While at the cell door, Rosse told Brown, "You've sent ya' last two cellies out on a stretcher to the infirmary.  I bet

4

you can't do that to Murdock." (Id. (emphasis omitted)).  Rosse then told Brown,

"If you can beat on [Murdock] the same way you beat on those other guys, I'll

make sure you get a bed in [general population]." (Id. ¶ 39 (emphasis omitted)).

Although Murdock pleaded with Rosse to stop provoking Brown, Rosse laughed at

Murdock and told him to stop complaining.[5] (Id. ¶¶ 40, 41.)

    Later that evening, after approximately 9 p.m., Murdock was asleep on the

top bunk in the cell when Brown awakened him by grabbing him around his neck

and pulling him off the top bunk. (Id. ¶¶ 42, 43.)  Brown placed Murdock into a

"sleeper hold," which cut off oxygen to Murdock's brain. (Id. ¶ 43.)  Murdock

passed out, and Brown proceeded to "violently and barbarically assault[] . . .

Murdock" for an unknown period. (Id. ¶ 44.)

    When Murdock finally woke up on March 4, 2020, he was in Mt. Nittany

Hospital. (Id. ¶ 45.)  He could not see because his eyes were swollen shut, and he

had a severe migraine headache, a fractured nose, and stitches in his face. (Id.)

Additionally, Murdock's entire body "was in non-stop agonizing pain." (Id.)

Murdock ended up spending one full day in the hospital and another seven (7) days

in SCI Benner's infirmary. (Id. ¶ 48.)  Murdock asserts that he still suffers from

pain, migraines, nightmares, anxiety, and extreme paranoia to this day. (Id. ¶ 46.)

---

[5]  Murdock alleges that this entire incident is on video. (Id. ¶¶ 39, 41.)

On November 25, 2020, after Murdock remitted the filing fee for this case, the Court entered an Order which, <u>inter alia</u>, dismissed Brown as a Defendant and directed the Clerk of Court to send copies of the complaint, requests to waive service, and waiver of service forms to the other Defendants.  (Doc. 5.)[6]  These Defendants waived service (Doc. 10), and they filed a motion to dismiss Murdock's claims against the DOC in the complaint on April 20, 2021 (Doc. 19).  They filed a supporting brief on May 25, 2021.[7]  (Doc. 25.)

On June 10, 2021, the Court entered a Memorandum and Order granting the motion to dismiss and dismissing with prejudice Murdock's claims against the DOC under Federal Rule of Civil Procedure 12(b)(6) because of its Eleventh Amendment Immunity.  (Docs. 26, 27.)  The remaining Defendants filed an answer with affirmative defenses to the complaint on June 27, 2021.  (Doc. 28.)  As relevant to this Memorandum, among Defendants' affirmative defenses was a claim that Murdock failed to exhaust his administrative remedies regarding his claims against them.  (<u>Id.</u> at 10.)

---

[6]  The Court dismissed Brown because Murdock failed to allege that he acted under color of state law for purposes of liability under Section 1983.  (Doc. 5 at 1 n.1.)

[7]  In between Defendants' filing of their motion and supporting brief, Murdock filed a motion seeking a default judgment (Doc. 20), which the Court denied on the day it was docketed (Doc. 21).

This matter than proceeded to discovery, after which Defendants filed a motion for summary judgment and statement of undisputed material facts in support of the motion on February 25, 2022.  (Docs. 44, 45.)  They filed a supporting brief on March 11, 2022.  (Doc. 47.)  Murdock filed a brief in opposition to the motion along with supporting exhibits on May 24, 2022.  (Docs. 56, 57.)  Defendants filed a reply brief to Murdock's response in opposition on June 7, 2022.  (Doc. 58.)

On July 19, 2022, the Court entered a Memorandum and Order granting in part and denying in part Defendants' motion for summary judgment.  (Docs. 59, 60.)  The Court granted the motion as to Murdock's (1) Section 1983 claims for monetary damages against Defendants in their official capacities, (2) Section 1983 claims against Supt. Marsh and Dunn due to lack of personal involvement in the alleged wrongdoing, (3) Section 1983 Fourth, Fifth, and Fourteenth Amendment claims, (4) Section 1983 Monell claims, and (5) claim for monetary damages under the Pennsylvania Constitution.  (Doc. 60 at 1.)  The Court denied the motion as to Murdock's (1) Section 1983 Eighth Amendment failure-to-protect claim against Ross, Terra, and Lt. Rininger, (2) Section 1983 claims for prospective injunctive relief against Defendants in their official capacities, and (3) claim for prospective injunctive relief under the Pennsylvania Constitution.  (Id. at 2.)  The Court further

denied the motion as to Defendants' argument that Murdock failed to exhaust his request for monetary relief.  (Id.)

Counsel entered appearances for Murdock in early November 2022.  (Docs. 66, 68.)  The Court entered an Order on January 4, 2023, which, inter alia, directed the parties to file a joint status report.  (Doc. 71.)  On January 24, 2023, the parties filed a joint status report in which they requested the Court to hold an exhaustion hearing.  (Doc. 72.)  The Court held an evidentiary hearing on exhaustion on August 3, 2023.[8]  (Doc. 84.)  The parties then timely filed their post-hearing written submissions (Docs. 89, 90).  The administrative exhaustion issue is now ripe for disposition.

---

[8]  A plaintiff is not entitled to a jury trial under the Seventh Amendment on the issue of whether they exhausted their administrative remedies under the PLRA. See Small v. Camden Cnty., 728 F.3d 265, 271 (3d Cir. 2013) ("In sum, we agree with the Second, Fifth, Seventh, Ninth, and Eleventh Circuits and hold that judges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury. . . .  [T]he District Court did not err by acting as the fact finder because exhaustion constitutes a preliminary issue for which no right to a jury trial exists.").  In addition, "'exhaustion of administrative remedies under the PLRA is a question of law to be determined by the judge.'"  Shumanis v. Lehigh Cnty., 675 F. App'x 145, 147 (3d Cir. 2017) (unpublished) (quoting Drippe v. Tobelinski, 604 F.3d 778, 782 (3d Cir. 2010)).  Thus, the Court must decide the exhaustion issue by holding an evidentiary hearing and resolving any factual disputes.  See, e.g., Jacobs v. Pittsburgh Police Dep't, No. 08-cv-00470, 2014 WL 3401656, at *4 (W.D. Pa. July 10, 2014) (adopting report and recommendation which explained that three circuit courts of appeals had determined that "district courts should resolve fact disputes about procedural exhaustion at a pre-trial evidentiary hearing" and recommended that the district court "conduct an evidentiary hearing to resolve the factual disputes among the parties regarding Plaintiff's exhaustion of administrative remedies").

## II.    DISCUSSION

### A.    Administrative Exhaustion Under the PLRA

The PLRA's exhaustion requirement mandates that "[n]o action shall be brought with respect to prison conditions under [S]ection 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a) (emphasis added).  In other words, exhaustion of available administrative remedies is a prerequisite for a prisoner asserting a claim under Section 1983 regarding their prison conditions.  See Rinaldi v. United States, 904 F.3d 257, 265 (3d Cir. 2018); see also Ross v. Blake, 578 U.S. 632, 638 (2016) (reiterating that the PLRA's "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies" (quoting Woodford v. Ngo, 548 U.S. 81, 85 (2006))); Jones v. Bock, 549 U.S. 199, 211 (2007) (stating that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court" (citation omitted) (alteration added)); Booth v. Churner, 532 U.S. 731, 733–34 (2001) (stating that the PLRA "now requires a prisoner to exhaust 'such administrative remedies as are available' before suing over prison conditions" (quoting 42 U.S.C. § 1997e(a))).  This requirement "applies to all inmate suits about prison life, whether they involve general

9

circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002).  Additionally, while this exhaustion requirement is not a jurisdictional bar to litigation, it is strictly enforced by the courts.  See Nyhuis v. Reno, 204 F.3d 65, 73 (3d Cir. 2000) (explaining that under the PLRA, courts may not excuse an incarcerated individual's compliance with the exhaustion requirement).

"The PLRA requires proper exhaustion, meaning 'complet[ing] the administrative review process in accordance with the applicable procedural rules.'" Downey v. Pa. Dep't of Corr., 968 F.3d 299, 305 (3d Cir. 2020) (alteration in original) (quoting Woodford, 548 U.S. at 88).  "These applicable procedural rules are supplied by the individual prisons." Id. (citations omitted).  Thus, determining whether "whether a prisoner has 'properly' exhausted a claim . . . is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances." Spruill v. Gillis, 372 F.3d 218, 222 (3d Cir. 2004); Jones, 549 U.S. at 218 (explaining that "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim"); Woodford, 548 U.S. at 90 (indicating that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules").

10

A prisoner's failure to follow a prison's procedural rules will result in a procedural default of their claims.  See Spruill, 372 F.3d at 230–32 (concluding that PLRA's exhaustion requirement includes a procedural default component); see also Drippe, 604 F.3d at 781 (pointing out that Spruill held "that the PLRA includes a procedural default component and the determination whether a prisoner properly exhausted a claim is made by evaluating compliance with the prison's specific grievance procedures").  "Consequently, an 'untimely or otherwise procedurally defective grievance or appeal' is insufficient to satisfy the PLRA's exhaustion requirement." Payne v. Pitkins, 447 F. App'x 291, 292 (3d Cir. 2011) (unpublished) (quoting Woodford, 548 U.S. at 83).  As such, courts have concluded that inmates who fail to fully, or timely, complete the grievance process are barred from subsequently litigating claims in federal court.  See Booth v. Churner, 206 F.3d 289, 299–300 (3d Cir. 2000) (concluding that district court properly dismissed plaintiff's Section 1983 excessive force action without prejudice because he never appealed prison's denial of grievances as set forth in Inmate Grievance System), aff'd 532 U.S. 731 (2001); Payne, 447 F. App'x at 292 (determining that district court properly found that plaintiff failed to properly exhaust claim where plaintiff untimely filed grievance).

An inmate's failure to exhaust may be excused, however, if the inmate can show that the administrative remedies were unavailable to them.  See Rinaldi, 904

11

F.3d at 266 ("The PLRA requires only 'proper exhaustion,' meaning exhaustion of those administrative remedies that are 'available.'" (quoting Woodford, 548 U.S. at 93)).  Administrative remedies are unavailable:

> (1) when the remedy "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when it is "so opaque that it becomes, practically speaking, incapable of use"; and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

Hardy v. Shaikh, 959 F.3d 578, 584 (3d Cir. 2020) (quoting Ross, 578 U.S. at 643–44).  Similarly, "[w]hen [an inmate] fail[s] to receive even a response to [a] grievance[] addressing the . . . incident[], much less a decision as to th[e] grievance[], the [administrative remedy] process was unavailable to [them]."  Small, 728 F.3d at 273.

Finally, requiring a prisoner to exhaust available administrative remedies before filing suit in federal court advances the policy justifications of the PLRA, i.e., to "return[] control of the inmate grievance process to prison administrators, encourag[e] the development of an administrative record, and perhaps settlements, within the inmate grievance process, and reduc[e] the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits."  Downey, 968 F.3d at 305 (citation and internal quotation marks omitted); see also Jones, 549 U.S. at 204 (explaining that exhaustion requirement "allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled

12

into court").  It also "reduces any incentive that prison officials otherwise might have to use threats to prevent inmates from exhausting their administrative remedies and thereby safeguards the benefits of the administrative review process for everyone."  <u>Rinaldi</u>, 904 F.3d at 268 (citation and internal quotation marks omitted).

### B.   Findings of Fact Relating to Administrative Exhaustion[9]

#### 1.   Facts Concerning DC-ADM 804

1.     DC-ADM 804 is the DOC's policy regarding inmate grievances.[10] (Doc. 86 at 5:7–12, 30:24–31:4.)

2.     Under DC-ADM 804, an inmate has fifteen (15) working days after an event to file an initial written grievance relating to that event.  (<u>Id.</u> at 5:13–15, 6:7–9, 31:7–8, 31:17–20.)

---

[9]  The following findings of fact are supported by the evidence in the record. Where a particular fact was controverted, the Court weighed the evidence and evaluated the credibility of the testifying witnesses to make a finding.

[10]  DCM-804 is available at https://www.cor.pa.gov/About%20Us/-Documents/DOC%20Policies/804%20Inmate%20Grievances.pdf (last visited July 8, 2024).  Under DC-ADM 804, the DOC requires every inmate in its custody to "have access to a formal procedure" through which the inmates can "seek resolution of problems or other issues of concern arising during the course of [their] confinement."  DC-ADM 804, Policy Statement, § 3.

Additionally, although Defendants identified DC-ADM 804 as an exhibit prior to the evidentiary hearing (Doc. 83-2, Ex. 1) no party introduced it as an exhibit and attempted to admit it during the hearing.  Nevertheless, the Court takes judicial notice of DC-ADM 804.

3.     The inmate's initial grievance can include only two (2) pages.  (Id. at 6:10–12, 31:21–32:5.)

4.     The two (2) pages can consist of the one-page grievance form along with one (1) additional page.  (Id. at 31:21–32:5; see, e.g., Doc. 45-6 (official inmate grievance form)).

5.     Upon receiving an inmate's grievance, it is assigned to a grievance officer for investigation and an initial review response.  (Doc. 86 at 5:15–17, 5:23–6:1.)

6.     The grievance officer will reject the grievance if it is not submitted in accordance with DC-ADM 804, such as, inter alia: (1) the grievance is untimely; (2) the grievance is longer than two (2) pages; (3) the inmate failed to provide supporting documentation; or (4) the grievance relates to multiple events.  (Id. at 6:2–6.)

7.     After receiving the initial review response from the grievance officer, an inmate may appeal to the facility manager if they are dissatisfied with the initial review response.  (Id. at 5:17–20, 31:12–14.)

8.     Upon receiving an inmate's appeal, the facility manager has the option to remand a grievance to the grievance coordinator if the initial review response did not address the inmate's issue in the grievance correctly or appropriately.  (Id. at 6:13–24.)

9.    If a facility manager remands a grievance to the grievance officer, there is no onus on the inmate to do anything until the time that the grievance officer renders another initial review response.  (Id. at 7:4–10, 17:14–17.)

10.   Once the grievance officer issues an initial review response on remand, the inmate may again appeal from the response to the facility manager if they are dissatisfied with the response.  (Id. at 33:23–34:1.)

11.   Upon receiving a response from the facility manager on appeal, an inmate dissatisfied with the facility manager's response may appeal to final review with the DOC Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). (Id. at 5:20–22, 31:14–16.)

12.   Under DC-ADM 804, SOIGA generally has thirty (30) working days from receipt of the final review appeal to respond to the appeal.  See DC-ADM 804 § 2.B.2.a(1) ("[A]n appeal to final review is responded to within 30 working days of receipt unless otherwise extended **and/or referred**[.]").

13.   "SOIGA will issue a decision with one of the following dispositions: Uphold Response, Uphold Inmate, Dismiss, or Uphold in Part/Deny in Part."  Id. § 2.B.2.e.

14.   An inmate may withdraw their grievance at any time.  (Doc. 86 at 7:11–13.)

15

15.    Under DC-ADM 804, an inmate seeking to withdraw a grievance must complete a specific form, which is signed by the grievance officer.  (Id. at 7:17–20.)

16.    After the withdrawal form is completed, it is sent to the inmate's counselor, who then meets with the inmate to ensure that the inmate was not forced to withdraw the grievance.  (Id. at 7:20–23.)

### 2.    Facts Concerning Murdock's Use of DC-ADM 804 Procedures

17.    Plaintiff was incarcerated at SCI Benner from February 2020 through April 2020.  (Doc. 1 ¶¶ 8, 21–48.)

18.    SCI Benner uses the Captor grievance tracking system to track grievances filed by inmates at SCI Benner.  (Doc. 86 at 8:13–15.)

19.    Once an official at SCI Benner receives a grievance, it is entered into the Captor system and is issued a number.  (Id. at 8:17–20.)

20.    All grievances, including any appeals to the facility manager or to SOIGA, are kept in the Captor system.  (Id. at 8:19–20.)

21.    SOIGA keeps paper and electronic copies of all records of appeals received from inmates pertaining to grievances they filed.  (Id. at 32:9–12.)

22.    The Captor system is updated daily by SCI Benner's grievance coordinator and her administrative officer.  (Id. at 8:21–9:3.)

23.     Murdock filed two (2) grievances in March 2020.  (Id. at 10:15–18; Defs.' Exs. 2, 3.)

24.     The two grievances were numbered 854683 and 858386.  (Doc. 86 at 10:19–21.)

25.     Both grievances related to an incident on March 3, 2020, in which Murdock's cellmate, Brown, assaulted him while he was sleeping.  (Id. at 35:25.)

26.     Murdock lost consciousness during Brown's assault.  (Id. at 38:2–4.)

27.     When Murdock regained consciousness, he was in Mount Nittany Hospital, where he was first told about the assault.  (Id. at 36:1–3.)

28.     Murdock was released from Mount Nittany Hospital and placed in SCI Benner's infirmary.  (Id. at 36:3–4.)

29.     Murdock submitted his first grievance, No. 854683 ("Grievance 854683"), which is dated March 9, 2020, on March 10, 2020.  (Id. at 12:1–9, 12:24–13:2, 21:2–7, 44:11–20; Defs.' Ex. 3.)

30.     Murdock wrote Grievance 854683.  (Doc. 86 at 46:13–16.)

31.     Grievance 854683 is legible and written in complete sentences.

32.     In Grievance 854683, which is two (2) pages in length, Murdock complained as follows:

> On 3/3/20 I, ERIC R. MURDOCK WAS VIOLENTLY ASSAULTED BY ANOTHER INMATE BY THE NAME OF BROWN.  INMATE BROWN WAS MY CELL-MATE [sic] WHEN HE SNATCHED ME FROM MY BED AND BEAT ME SO BAD

THAT MY FACE IS FRACTURED AND SWOLLEN.  I WAS UNCONSCIOUS AT ONE POINT AND DID NOT KNOW WHAT WAS GOING ON OR THAT I GOT ASSAULTED.

I CAN REMEMBER ASKING THE R.H.U[.] C/O ROSSE TO MOVE MY CELL ON THE 2ND OF MARCH AT 3:45pm. BECAUSE TO ME SOMETHING WAS OFF (MENTALLY) WITH INMATE BROWN.  C/O ROSSE TOLD ME THAT "HE KNOWS BUT HE IS NOT MAKING NO MOVES."

ON THE SAME DAY 3/2/20 BETWEEN 5pm. – 9pm. Lt. RININGER CAN BE SEEN ON CAMERA AT MY CELL DOOR TALKING WITH INMATE BROWN ABOUT HIS BED AVAILABILITY, MENTAL HEALTH PROBLEMS AND NOT GOING TO P.R.C[.] ON HIS SHIFT.

THE DAY I ARRIVED TO THE R.H.U[.] 2/28/20 INMATE BROWN ASKED THE R.H.U[.] STAFF NO [sic] TO PUT ME IN HIS CELL.  I WAS PLACED IN CELL 218 ANYWAY.  THERE WAS NO CARE FOR MY SAFETY, WELL-BEING, OR LIFE. FORTUNATELY, ON THE 3rd OF MARCH I DID NOT DIE IN THIS ENVIRONMENT.

I, ERIC R. MURDOCK, WAS DELIBERTY [sic] PLACED IN DANGER WHEN I WAS PUT IN THE CELL WITH INMATE BROWN.  BECAUSE THE STAFF IN THIS FACILITY KNEW INMATE BROWN HAD MENTAL ISSUES HE WAS SUFFERING FROM, I SHOULD NOT HAVE BEEN PLACED IN THAT CELL.

I, ERIC R. MURDOCK, AM SEEKING RELIEF FOR MY PAIN AND SUFFERING, MENTAL AND PHYSICAL DAMAGES. I CAN'T SLEEP, HAVE BAD HEAD ACHES [sic] AND NIGHTMERES [sic].

I AM ASKING FOR THE R.H.U[.] STAFF TO BE REPRIMAND [sic] FOR NOT TAKING MENTAL HEALTH PROPERLY AND ALLOWING THIS TO HAPPEN TO ME.

(Defs.' Ex. 3.)

33.     Murdock filed Grievance 854683 seven (7) days after the date of the alleged assault (Doc. 86 at 44:21–24) and eight (8) days after (a) he allegedly asked Rosse to move him from the cell with Brown and (b) Lt. Rininger allegedly spoke to Brown.

34.     Murdock timely filed Grievance 854683 because he filed it within fifteen (15) working days of Brown's assault on March 3, 2020.

35.     An initial review response was not rendered for Grievance 854683 because Murdock ultimately withdrew this grievance.  (Doc. 86 at 13:3–11.)

36.     No one told Murdock to withdraw Grievance 854683.  (Id. at 37:10–11.)[11]

37.     At the time Murdock decided to withdraw Grievance 854683, he was still in the infirmary.[12]  (Id. at 35:18–21.)

_____

[11]  Shortly before this cited testimony, Murdock testified that "(Inaudible) kept asking me to withdraw my grievance, and I just withdrew my grievance because . . . I just wanted to be left alone."  (Doc. 86 at 37:3–6.)  To the extent that Murdock testified that prison staff kept asking him to withdraw Grievance 854683, the Court finds this testimony to be incredible.  In addition, Murdock's desire to be left alone would not support a finding that he did not knowingly and voluntarily withdraw this grievance.

[12]  Defendants' witnesses at the evidentiary hearing could not recall whether Murdock was in the infirmary during the process of him withdrawing Grievance 854683.  (Doc. 86 at 25:13–15, 28:16–18.)  Nevertheless, Murdock credibly testified that he was still in the infirmary at the time he decided to withdraw his grievance.  The Court also notes that Defendants attached a copy of Murdock's cell history to their motion for summary judgment, and this cell history reflects that Murdock was in the infirmary until March 13, 2020.  (Doc. 45-2 at 2.)

38.     At the time Murdock decided to withdraw Grievance 854683, he claims that both of his eyes were swollen shut and his nose was fractured.  (Id. at 37:20–23.)

39.     Murdock's physical condition did not affect his ability to knowingly and voluntarily withdraw Grievance 854683.[13]

40.     At the time Murdock decided to withdraw Grievance 854683, he claims that he could not think and speak normally because he was "on medication," namely "Tylenol 4 or Tylenol 3."  (Id. at 37:15–19.)

41.     Murdock's taking of "Tylenol 4 or Tylenol 3" did not affect his ability to knowingly and voluntarily withdraw Grievance 854683.[14]

42.     Murdock claims that he withdrew Grievance 854683 "because [he] kept being taken in and out of [his] infirmary bed to the security office and they kept coming in [his] room to question [him, and at] that time, [he] was kinda [sic] afraid for [his] life."  (Id. at 35:19–22.)

---

[13]  Murdock admitted that he wrote Grievance 854683.  If his eyes were swollen shut as he claims, he would not have been able to write this grievance.  The Court finds Murdock's testimony concerning the effect of his physical condition on his capacity to withdraw his grievance to be incredible.

[14]  To the extent Murdock is attempting to assert that he did not knowingly withdraw his grievance due to his taking of Tylenol, the Court finds his testimony to be incredible.

43.     Murdock being taken in and out of his infirmary bed, his discussions with security, and his alleged fear for his life did not affect his ability to knowingly and voluntarily withdraw Grievance 854683.[15]

44.     To withdraw the grievance, Murdock signed a grievance withdrawal form ("Withdrawal Form").  (Id. at 13:9–11, 23:21–24:20, 26:7–25; 44:25–45:3; Defs.' Ex. 3.)

45.     The Withdrawal Form contains the signature of a grievance officer/coordinator, Cpt. Robert Williamson ("Cpt. Williamson").  (Defs.' Ex. 3.)

46.     Cpt. Williamson signed the Withdrawal Form on March 11, 2020. (Doc. 86 at 27:11–25.)

47.     At the time of the evidentiary hearing, Cpt. Williamson had worked for the DOC for 24 years.  (Id. at 26:18–21.)

48.     Although Cpt. Williamson now works at Central Office for the DOC, in March 2020, he was working at SCI Benner.  (Id. at 26:15–17, 26:22–24.)

49.     During his time as a Captain at SCI Benner, he completed inmate grievance withdrawal forms with inmates.  (Id. at 26:25–27:2.)

---

[15] While the Court does not discount the serious trauma Murdock seemingly experienced due to Brown's assault, the Court does not find Murdock's statement that he withdrew Grievance 854683 out of fear for his life to be credible.  He was in the infirmary at the time and, as he mentioned, he was having conversations with security.  He also did not explain why being questioned by security or being taken in and out of the infirmary would have caused him to withdraw this grievance.

50.     Cpt. Williamson would not have signed the Withdrawal Form if he thought that Murdock was being coerced to withdraw Grievance 854683.  (Id. at 28:1–3.)

51.     Cpt. Williamson would not have signed the Withdrawal Form if he thought that Murdock was incoherent and unable to make decisions for himself. (Id. at 28:4–6.)

52.     Cpt. Williamson acted on Murdock's withdrawal of Grievance 854683 as he would with any other form he worked with during his career.  (Id. at 28:7–10.)

53.     Murdock met with his correctional counselor, Olivia Halfpenny-Fishbaine ("Counselor Halfpenny-Fishbaine"), to discuss his intent to withdraw Grievance 854683 on March 18, 2020.  (Id. at 23:14–16, 24:16–17.)

54.     This meeting occurred fifteen (15) calendar days after Brown's assault on March 3, 2020.

55.     During Murdock's meeting with Counselor Halfpenny-Fishbaine, Murdock confirmed that he wanted to withdraw Grievance 854683.  (Id. at 24:16–20, 45:4–11.)

56.     Counselor Halfpenny-Fishbaine signed the Withdrawal Form on March 18, 2020.  (Id. at 24:1–9; Defs.' Ex. 3.)

57.   By signing the Withdrawal Form, Counselor Halfpenny-Fishbaine verified that she met with Murdock, he was not coerced into withdrawing Grievance 854683, and he still wished to withdraw Grievance 854683. (Doc. 86 at 24:16–20.)

58.   Counselor Halfpenny-Fishbaine would not have signed the Withdrawal Form if she thought that Murdock was being coerced into withdrawing Grievance 854683. (Id. at 24:21–23.)

59.   Counselor Halfpenny-Fishbaine would not have signed the Withdrawal Form if she thought that Murdock was incoherent and unable to decide whether to withdraw Grievance 854683. (Id. at 24:24–25:2.)

60.   Counselor Halfpenny-Fishbaine, who dealt specifically with grievance withdrawal forms at SCI Benner, handled Murdock's withdrawal of Grievance 854683 as she would have when other inmates decided to withdraw grievances. (Id. at 22:25–23:5, 25:3–6.)

61.   Murdock voluntarily and knowingly withdrew Grievance 854683.

62.   Via an Inmate's Request to Staff Member dated March 22, 2020, Murdock requested the following:

Deputy Booher,

  I AM WRITING YOU TO INQUIRE ABOUT THE PROCESS THE PRISON MADE TO HAVE ME TALK WITH THE SECURITY DEPARTMENT AFTER COMING FROM THE HOSPITAL.

23

I DONT [sic] BELIEVE AS IF [sic] I WAS MENTALLY
ADEQUATE TO ANSWER QUESTIONS OR PUT MY SIGNATURE
ON ANYTHING.

DID A DOCTOR CLEAR ME TO MAKE RATIONAL
DECISIONS?

I REMEMBER BEING ASKED QUESTIONS ABOUT
PRESSING CHARGES ON THE INMATE THAT ASSAULT [sic]
ME, BUT I DONT [sic] REMEMBER WHAT I SIGNED OR WHAT
ELSE HAPPEND [sic].

PLEASE HELP ME UNDERSTAND WHAT HAPPEND [sic]
SIR.

(Pl.'s Ex. 1.)

63.    Murdock received the following response to this request from

Lieutenant Hoffman on April 7, 2020:

YOU WERE INTERVIEWED TWICE AND ASKED IF YOU
WANTED CHARGES PRESSED.  YOU RESPONDED IN THE
NEGATIVE BOTH TIMES.  CHARGES CAN STILL BE BROUGHT
AGAINST THE INMATE.  PLEASE NOTIFY THE SECURITY
OFFICE IF THIS IS THE CASE.

(Id.)

64.    Murdock filed his second grievance, No. 858386 ("Grievance

858386"), which is dated March 26, 2020, on March 27, 2020.  (Doc. 86 at 15:9–

12; 21:18–20, 45:25–46:5; Defs.' Ex. 4.)

65.    Murdock wrote Grievance 858386.  (Doc. 86 at 46:13–16.)

66.    Grievance 858386 is three (3) pages in length, consisting of the

grievance form and two additional pages.  (Id. at 15:18–20; Defs.' Ex. 4.)

67.    Murdock's filing of a grievance with three pages was improper under

DC-ADM 804.  (Id. at 15:21–23.)

68.    In Grievance 858386, Murdock complained as follows:

THE REASON WHY IM [sic] FILING THIS GRIEVANCE IS BECAUSE I FEEL AS IF THIS INSTITUTION "S.C.I[.] BENNER TOWNSHIP" FAILED TO PROTECT ME FROM BEING VIOLENTLY ASSAULTED AND SERIOUSLY INJURIED [sic] AT THE HANDS OF ANOTHER INMATE.

ON THE DATE OF MARCH 3, 2020[,] I WAS PHYSICALLY REMOVED FROM MY BED AND BEATEN SO LONG THAT MY NOSE WAS FRACTURED AND MY HEAD AND EYES SWELLED (2X) TWO TIMES THE SIZE IT SHOULD HAVE BEEN.

OFFICIALS IN THIS INSTITUTION ALLOWED ME TO BE ASSAULTED SO LONG, THAT NO ONE REALLY KNOWS THE AMOUNT OF TIME I WAS SUFFERING BEFORE A C/O RESPONDED.

FOR A MULTITUDE OF REASONS, ME AND INMATE "BROWN" SHOULD HAVE NEVER BEEN HOUSED IN THE SAME CELL FOR THAT LONG.

OFFICIALS WORKING IN THE "RHU" KNEW ABOUT THE DISRUPTIVE BEHAVIOR OF INMATE BROWN.  C/O ROSSE HADE [sic] NUMEROUS THINGS TO SAY AND JOKE ABOUT, IMPLEMENTING [sic] THAT INMATE "BROWN" HAD PROBLEMS WITH PREVIOUS CELLMATES BEFORE ME.

THEREBY, CREATING EXCESSIVE RISK OF HARM FOR ME.  THERE SHOULD BE INCIDENT REPORTS VERIFYING HOW MANY CELLMATES WERE MOVED OUT OF THE CELL WITH "BROWN" BEFORE I WAS ASSAULTED.

AS WELL, I ASKED C/O ROSSE TO MOVE ME OUT OF CELL 218 ON THE DATE 3/2/20 AT 4pm. AFTER SHOWERS.

25

THE CONDITIONS IN THIS INSTITUTIONS [sic] "RHU" IS [sic] ANOTHER REASON WHY I SUFFERED THESE INJURIES BY INMATE BROWN.  BECAUSE INMATE BROWN WAS ONLY IN THE "RHU" PENDING BED AVAILABILITY HE WAS A (AC) ADMINISTRATIVE CUSTODY INMATE.

HE, INMATE BROWN[,] KEPT TELLING THE OFFICIALS THAT HE DID NOT BELONG IN THE "RHU" NO MORE, HIS (DC) DISCIPLINARY CUSTODY TIME WAS OVER. LT. RININGER, KNEW THAT THIS INMATE SHOULD HAVE BEEN OUT OF THE "RHU," BUT BECAUSE THERE IS NO BED SPACE IN THIS INSTITUTION I GOT PHYSICALLY ASSAULTED.

"RELIEF THAT IM [sic] SEEKING"

AS MY MEDICAL RECORDS SHOW AND PLAINLY DONT [sic] SHOW… IM [sic] SUFFERING EVERY DAY.  HEADACHES, PAIN IN MY FACE AND EYES, ANXIETY, NIGHTMARES . . . MY WORLD HAS BEEN TURNED UPSIDE DOWN.

I AM ASKING THAT A [sic] INVESTIGATION INTO MY ASSAULT BE PROPERLY DONE BECAUSE FOR SOME REASON OFFICIALS ALLOWED ME TO SUFFER BEING ASSAULTED WITHOUT RESPONDING IN ADEQUATE TIME.

I AM ASKING FOR A LIST OF ALL THE OFFICIALS [sic] NAMES WHO ARE RESPONSIBLE FOR "BED AVAILABILITY" IN THIS INSTITUTION.

I AM ASKING THAT THESE OFFICIALS BE PUNISHED (TERMINATED) C/O ROSSE, LT JACKSON, LT RININGER, PSS. DUNN . . . FOR NOT MAKING THE RIGHT MOVES FOR MY SAFETY.

AS WELL, I AM SEEKING COMPENSATORY DAMAGES FOR SUFFERING PHYSICAL INJURIES; MENTAL AND EMOTIONAL ANGUISH.

(Defs.' Ex. 4.)

69.     Murdock did not timely file Grievance 858386 because he did not file it within fifteen (15) working days from the events of which he was complaining, the latest of which was March 3, 2020.  (Id.; Doc. 86 at 15:24–16:8.)

70.     On March 27, 2020, the same date Murdock filed Grievance 858386, SCI Benner grievance officer J. Burd filed a "Rejection Form," rejecting this grievance because Murdock failed to comply with DC-ADM 804 insofar as "[t]he issue(s) presented on the . . . grievance has been reviewed or is currently being reviewed and addressed" via Grievance 854683.  (Defs.' Ex. 4; Doc. 86 at 16:9–22.)

71.     Murdock filed an appeal from the initial rejection to the facility manager, which was dated April 6, 2020, and received on April 7, 2020.[16]  (Defs.' Ex. 4; Doc. 86 at 16:23–17:2, 46:10–12, 47:17–19.)

72.     Murdock wrote this appeal.  (Doc. 86 at 46:13–16, 47:8–9.)

---

[16] The transcript from the evidentiary hearing indicates that the grievance was received on "August 7th of 2020."  (Doc. 86 at 17:2.)  This appears to be either a typographical error or a misstatement from the witness providing the testimony because Murdock's facility manager appeal is stamped as being received on April 7, 2020.  (Defs.' Ex. 4.)  In addition, the witness later testified that the facility manager remanded the grievance, which is precisely what occurred with Murdock's April 7, 2020 appeal to the facility manager, as discussed infra.  There was no other evidence introduced which would support a finding that Murdock filed any appeal on August 7, 2020.

73.     Upon review of Murdock's appeal, the facility manager remanded the grievance to the grievance officer on April 29, 2020.  (Defs.' Ex. 4; Doc. 86 at 17:3–13.)

74.     In remanding the grievance, the facility manager explained:

In accordance with the provisions of DC-ADM 804, Inmate Grievance System Policy, the Facility Manager has reviewed your initial grievance, the initial review response, and the issues you raised in your appeal.  Upon completion of this review, it is the determination of this Office to return your grievance to the respective Grievance Officer for additional review and appropriate response.

. . .

In accordance with the procedures set forth in the DC-ADM 804, the Grievance Officer will provide you with a revised response.  If you remain dissatisfied with the revised response, you may once again appeal to the Facility Manager within 15 working days of the date of the revised decision.

(Defs.' Ex. 4.)

75.     On April 29, 2020, the grievance officer rejected Grievance 858386 on remand due to its "failure to comply with the provisions of the DC-ADM 804." (Defs.' Ex. 4; Doc. 86 at 17:24–18:1.)

76.     The grievance officer stated that Grievance 858386 failed to comply with DC-ADM 804 because it (1) "was not submitted within fifteen (15) days after the events upon which claims are based," (2) "exceeded the two page limit," and (3) presented issues which have "been reviewed or [are] currently being reviewed and addressed" via Grievance 854683.  (Defs.' Ex. 4.)

77.    On or about May 12, 2020, Murdock sent items relating to Grievance

858386 to SOIGA.  (Id.; Doc. 86 at 18:5–19:9.)

78.    SOIGA treated Murdock's submission, which was dated May 12,

2020, as an appeal and, through a response dated June 1, 2020, concluded that such

an appeal was premature because he did not first file an appeal from the remanded

rejection to the facility manager.  (Defs.' Ex. 4; Doc. 86 at 18:23–19:9, 32:13–22.)

79.    In SOIGA's response,[17] it explained:

> I am in receipt of your appeal to this office dated 5/12/20 for the above
> referenced grievance number.  Please be advised, your appeal to this
> office is found to be premature.  Review of our tracking system finds
> that the next step in your appeal process for this grievance would be to
> appeal the Remanded Rejection to the Facility Manager.  Once you
> receive their response and if you remain dissatisfied, you may then
> submit a timely written appeal to Final Review.  I encourage you to
> review the DC ADM 804 in its entirety to ensure you are familiar with
> the grievance process.

(Defs.' Ex. 4; Doc. 86 at 18:25–19:9, 33:8–34:5.)

80.    Murdock appealed from the remanded rejection by submitting an

Inmate Appeal to Facility Manager, dated June 12, 2020, which was received by

SCI Benner staff on June 15, 2020.  (Defs.' Ex. 4; Doc. 86 at 19:13–18, 47:19–25.)

81.    Murdock wrote this appeal.  (Doc. 86 at 48:1–3.)

---

[17]  Michael Bell ("Bell"), a grievance officer with SOIGA since 2013, testified that
SOIGA's response was called a "file without action," i.e., SOIGA's
"correspondence back to the inmate."  (Doc. 86 at 30:16–23, 32:23–33:7; Defs.'
Ex. 4.)

82.     Murdock admits that Grievance 854683, Grievance 858386, his April

7, 2020 Inmate Appeal to Facility Manager, and his June 15, 2020 Inmate Appeal

to Facility Manager were legible.  (Id. at 46:13–16, 47:19–48:5.)

83.     In Murdock's Inmate Appeal to Facility Manager, he provided the

following statement:

> I, ERIC MURDOCK AM SEEKING A TIME EXTENSION OF THE FOLLOWING GRIEVANCE APPEAL FOR THE REASON(S) STATED HEREIN:
>
> A MISINTERPRETATION OF THE GRIEVANCE SYSTEM PROCEDURES MANUAL, DUE TO A LACK OF AVAILABILITY TO THE INMATE LIBRARY BECAUSE OF THE PANDEMIC.
>
> RESPECTFULLY, I ASK THAT YOU TAKE A SECOND LOOK AT THE ISSUES PUT FORTH OF [sic] APPEAL[.]
>
> (1) MY MEDICAL CONDITION AT THE TIME OF MY FAILING OF THE GRIEVANCE WAS INSUFFERABLE BECAUSE OF MY INJURIES.  I WAS HOUSED IN [THE] INFIRMARY, NOT ABLE TO MAKE RATIONAL DECISIONS.
>
> (2) OFFICIALS IN THE INSTITUTION HAVE NOT ADDRESSED THE FACT THAT I WAS PHYSICALLY ASSAULTED DUE TO PRISON CONDITIONS.
>
> (3) LT. RININGER, HAD KNOWLEDGE OF THE OVERCROWDED CONDITIONS IN THE INSTITUTION THAT CONTRIBUTED TO MY ASSAULT BUT FAILED TO RESPOND REASONABLY.
>
> (4) C/O ROSSE HAD KNOWLEDGE THAT THERE WAS A SUBSTANTIAL RISK TO MY SAFETY BECAUSE OF INMATE BROWN'S BEHAVIOR HISTORY.

> FOR THE FOLLOWING REASON(S) I SUBMIT THIS GRIEVANCE APPEAL BECAUSE NO ONE HAS ADDRESSED THESE WITH ME.  I LIVE WITH ANXIETY, NIGHTMARES AND UNCERTAINTY.

(Defs.' Ex. 4.)

84.    On June 30, 2020, the facility manager issued an appeal response to Murdock's appeal, which upheld the remanded initial rejection.  (Id.; Doc. 86 at 19:19–20:4.)

85.    The facility manager's appeal response stated:

> I have reviewed your Official Inmate Grievance, Initial Grievance Rejection, Grievance Appeal, and facts surrounding your complaint.

> In investigating the issues in which you claim, I see where the Grievance Coordinator rejected the above referenced Initial Grievance because the grievance was not filed in accordance with departmental policies and procedures.  In your Initial Grievance, you were grieving the fact that you [sic] on March 3, 2020 you were physically removed from your bed and beaten by another inmate.

> A review of the CAPTOR Grievance Tracking system reveals that your Initial Grievance was received on March 27, 2020.  In accordance with DC-ADM 804, Inmate Grievance System Procedures Manual Section 1-Grievances & Initial Review A. 8. The [sic] inmate must submit a grievance to the Facility Grievance Coordinator/designee, usually the Superintendent's Assistant, within 15 working days after the event upon which the claim is based.

> In addition, your Initial Grievance consisted of three pages.  In accordance with DC-ADM 804, Inmate Grievance System Procedures Manual Section 1-Grievances & Initial Review A. 12. The [sic] statement of facts must not exceed two pages and must be handwritten or typed on writing paper (one DC-804, Part 1 and one one-sided 8 ½" x 11" page).

31

Lastly, the issues that you presented within this Initial Grievance were previously addressed within Initial Grievance #854683. In accordance with DC-ADM 804, Inmate Grievance System Procedures Manual Section 1-Grievances & Initial Review A. 15. Any [sic] grievance issue that has been or is currently being addressed will not be re-addressed in a subsequent grievance.

Based on the information provided, I do not see where your grievance was filed in accordance with departmental policy and procedures.

The Initial Grievance Rejection is Upheld.

(Defs.' Ex. 4; Doc. 86 at 19:25–20:20.)

86.     According to Bell's review of SOIGA's file for Grievance 858386, Murdock never submitted an appeal from the facility manager's appeal response to SOIGA. (Doc. 86 at 34:11–15.)

87.     Nevertheless, Murdock typed, signed, and sent a letter, dated July 7, 2020, and titled, "INMATE APPEAL TO FINAL REVIEW," to SOIGA ("July 7th Letter"). (Pl.'s Ex. 2;[18] Doc. 86 at 41:17–42:7, 49:8–50:15.)

88.     Murdock asserts that he had to type the July 7th Letter because the prison, which was amid the COVID-19 pandemic, lacked inmate appeal to SOIGA forms. (Doc. 86 at 42:8–13.)

89.     In the July 7th Letter, Murdock stated as follows:

Grievant incorporates by reference herein, as if stated here in full and at length, the initial grievance, attachments & Petitioners [sic] DOC

---

[18] During the hearing, the Court took the admissibility of this exhibit under advisement. (Doc. 86 at 41:13–14, 42:14–16.) The Court finds Plaintiff's Exhibit 2 to be authentic and admissible.

medical records.  I can only hope & pray, that the honorable men and women in your office will not allow the viscious [sic] attack, that I was subjected too [sic], to be eclipsed by something as frivolous as "one extra piece of paper".  The assault I fell victim to in your facilities [sic] RHU, exposes your current training curriculum's flaws, is contrary to law and fails to protect.

Requested relief is warranted.

(Pl.'s Ex. 2.)

90.     Along with the July 7th Letter, Murdock asserts that he typed, signed, and sent a document dated July 7, 2020, and titled, "INMATE APPEAL TO FINAL REVIEW GRIEVANCE--ATTACHMENT," to SOIGA ("July 7th Attachment").[19]

(Pl.'s Ex. 3;[20] Doc. 86 at 42:24–43:12; 51:6–9.)

91.     Murdock testified that he had to type the July 7th Attachment because the prison lacked the forms for him to file an appeal.  (Doc. 86 at 43:13–15.)

92.     The July 7th Attachment states as follows:

Grievant incorporates by reference herein, as if stated here in full and at length, the initial grievance, attachments & Petitioners [sic] DOC medical records.

---

[19]  Although Plaintiff testified that he sent this document to SOIGA, it is unclear whether he included it with the July 7th Letter or sent it separately.  Unlike the July 7th Letter, the July 7th Attachment does not contain SOIGA's address in Mechanicsburg.  In addition, while Murdock titled the document as being related to his Inmate Appeal to Final Review, the body of the document (as indicated below) appears to relate to his June 15, 2020 Inmate Appeal to Facility Manager.

[20]  During the hearing, the Court also took the admissibility of this exhibit under advisement.  The Court finds Plaintiff's Exhibit 3 to be authentic and admissible.

I'm reaching back out to you, for a response to my last appeal filed, 6/12/20. The (15) days in which you were to respond per DC-ADM 804, expired 7/3/20. The "Remanded Rejection", dated 4/29/20, authored by (F.G.C[.]) J. Burd, is hereby denied as incorrect contrary to the facts and otherwise meritless. The assault I fell victim to in your facilities [sic] RHU, exposes your current training curriculum's flaws, is contrary to law and fails to protect.

Requested relief is warranted.

(Pl.'s Ex. 3.)

93.     SOIGA sent Murdock a document dated August 3, 2020, and titled,

"ACTION REQUIRED" ("SOIGA's AR") seemingly in response to one of

Murdock's July 7, 2020 documents. (Defs.' Ex. 7.)[21]

94.     SOIGA's AR references Grievance 858386. (Id.)

95.     SOIGA's AR informed Murdock that:

Review of the information you provided indicates that your appeal is incomplete. You are not permitted to appeal to this office unless you have complied with the procedures established in the DC-ADM 804 requiring that all documentation relevant to the appeal be provided upon appeal. Therefore, you have fifteen (15) working days from the date of this notice to provide this office with all completed documents necessary for conducting final review. A failure to provide the missing information (identified below) within this time period may result in a dismissal of your appeal. Further, any future appeals received that do not contain the required documents may result in an immediate dismissal. This notice is only a courtesy of this office and may not be provided again.

(Id.)

---

[21] Prior to the evidentiary hearing, Murdock had not provided SOIGA's AR to his counsel and, as such, it had not been provided to defense counsel. (Doc. 86 at 51:19–22, 52:5–10.) Nevertheless, counsel reviewed it during the hearing.

96.    SOIGA's AR also informed Murdock that he needed to provide SOIGA with his (1) "Initial review response and/or rejection" and (2) "Remanded initial review response or rejection."  (Id.; Doc. 86 at 54:14–19.)

97.    SOIGA's AR was signed by Grievance Review Officer Amanda West. (Defs.' Ex. 7.)

98.    SOIGA's AR treated Murdock's filing as an appeal to final review. (Defs.' Ex. 7.)

99.    Murdock asserts that SOIGA's AR serves as proof that he mailed the July 7th Letter and July 7th Attachment to SOIGA.  (Doc. 86 at 50:16–23, 51:6–12.)

100.    In response to SOIGA's AR, Murdock sent a letter dated August 11, 2020, to Ms. West, in which he purports to include a copy of the Initial Review Response and Remanded Initial Review Response ("August 11th Letter").  (Id. at 54:20–24, 55:11–16; Defs.' Ex. 8.)

101.    Murdock never received a response to the August 11th Letter.  (Doc. 86 at 55:11–16.)

102.    Bell did not see the August 11th Letter in his review of the SOIGA file for Grievance 858386.  (Id. at 57:18–24.)

### C.      Analysis Relating to Administrative Exhaustion

The failure to exhaust available administrative remedies "is an affirmative defense under the PLRA."  <u>See</u> <u>Jones</u>, 549 U.S. at 216.  As such, "[t]he burden to plead and prove failure to exhaust as an affirmative defense rests on the defendant."  <u>See</u> <u>Rinaldi</u>, 904 F.3d at 268 (citing <u>Ray v. Kertes</u>, 285 F.3d 287, 295 (3d Cir. 2002)).  However, "once the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to [them]."  <u>See</u> <u>id.</u> (citation omitted).

Here, Defendants argue that Murdock failed to exhaust his administrative remedies as to Grievances 854683 and 858386.  (Doc. 89 at 15–19.)  Concerning Grievance 854683, Defendants point out that Murdock withdrew this grievance and, as such, never appealed it to SOIGA.  (<u>Id.</u> at 15.)  They also argue that Murdock's excuses for withdrawing his grievance are meritless and otherwise do not show that any administrative remedies were unavailable to him.  (<u>Id.</u> at 16–17.)  Regarding Grievance 858386, Defendants contend that Murdock failed to exhaust his claims in this grievance because he never properly appealed it to SOIGA.  (<u>Id.</u> at 18.)  Defendants further contend that Murdock procedurally defaulted his claims because (1) he filed an untimely grievance, (2) his grievance was a page too long, and (3) he had previously filed and withdrew a grievance relating to the same events.  (<u>Id.</u> at 17–18.)

36

In response to Defendants' arguments, Plaintiff contends that he exhausted his administrative remedies because the administrative appeal process was unavailable to him insofar as SOIGA failed to respond to his appeal. (Doc. 90 at 2–3.) He also points out that even if he untimely filed Grievance 858386, "[a] late filing that the system accepts and resolves on the merits satisfies the exhaustion requirement." (Id. at 2 (citations omitted)). He further argues that equitable tolling applies to the filing of Grievance 858386 because he was in fear for his life when he withdrew Grievance 854683. (Id. at 3.)

This Court must initially address the parties' dispute over whether Murdock appealed from the facility manager's June 30, 2020 decision upholding the denial of Grievance 858386 due to its failure to comply with DC-ADM 804. As the factual record sufficiently shows, the resolution of this dispute is simple: Murdock appealed from the facility manager's June 30, 2020 decision to SOIGA. Even though Bell testified that SOIGA's records did not show any appeal, SOIGA responded to something (presumably the July 7th correspondence) Murdock sent it via SOIGA's AR. In addition, the record demonstrates that SOIGA recognized Murdock had appealed to final review as demonstrated through several statements in SOIGA's AR:

- "This serves to acknowledge receipt of information based on **your intent to appeal** the grievance noted below to final review."

- "Review of the information you provided indicates that **your appeal** is incomplete."

- "A failure to provide the missing information (identified below) within this time period may result in a dismissal of **your appeal**."

(Defs.' Ex. 7.)

Strangely, Defendants do not mention SOIGA's AR in their proposed findings of fact and conclusions of law despite its apparent authenticity and relevance to the administrative exhaustion issue. Equally as strange is that this document was not in SOIGA's records for Grievance 858386 according to Bell's review of SOIGA's records related to Murdock filed in March 2020. (Doc. 86 at 32:13–16, 34:11–15.) Instead, the only appeal to final review document in Murdock's SOIGA file was his May 12, 2020 premature appeal to final review, which he improperly filed prior to appealing the decision on his remanded grievance to the facility manager. (Id. at 32:17–34:10.)

Putting SOIGA's record-keeping issues aside, even though Murdock filed an appeal to final review, SOIGA's AR shows that the appeal was incomplete insofar as Murdock had failed to attach two documents to his appeal. (Defs.' Ex. 7.) Murdock claims that he responded to SOIGA's AR by sending the requested documents along with the August 11th Letter. (Defs.' Ex. 8.) The Court finds Murdock's claim to be credible, i.e., he properly and timely responded to SOIGA's AR by mailing the requested documents to SOIGA. Although Murdock mailed the

38

requested documents, there is, unfortunately, no evidence in the record that SOIGA ever received them, as Murdock does not have any documentation showing that SOIGA received his August 11th Letter with attachments, and it is not included in SOIGA's records.  This being the case, the question turns to how to resolve these circumstances where Murdock did what he was supposed to do (by timely appealing to SOIGA and then timely responding to SOIGA's request for documents), but SOIGA seemingly could not do what it was supposed to do if it did not have the requested documents.  Both Murdock and SOIGA appear to be blameless.  Nevertheless, upon closer examination, it appears that SOIGA is the erring entity.

As already explained, SOIGA's AR shows it received Murdock's appeal to final review.  Once it received the appeal, it had to issue a decision on the appeal. See DC-ADM 804 § 2.B.2.e. ("SOIGA will issue a decision with one of the following dispositions:  Uphold response, Uphold Inmate, Dismiss, or Uphold in Part/Deny in Part.").  If Murdock timely supplied the missing documents, SOIGA would have ruled on his appeal.  If Murdock did not, which would have occurred if SOIGA did not have his August 11th Letter in its file, then SOIGA should have dismissed the appeal or possibly requested the additional information again.  See (Defs.' Ex. 7 (explaining that SOIGA's AR "is only a courtesy of this office and may not be provided again")).  SOIGA acknowledged as much in SOIGA's AR

when it admonished Murdock: "A failure to provide the missing information . . . within this time period **may result in a dismissal of your appeal**." (Id.) Yet, presuming SOIGA did not receive Murdock's August 11th Letter, it neither dismissed the appeal nor requested the missing information again. Ultimately, SOIGA's failure to decide Murdock's appeal means that the appeals process was unavailable to him for exhaustion purposes. See Shifflett v. Korzniak, 934 F.3d 356, 365 (3d Cir. 2019) ("[A]s soon as a prison fails to respond to a properly submitted grievance or appeal within the time limits prescribed by its own policies, it has made its administrative remedies unavailable and the prisoner has fully discharged the PLRA's exhaustion requirement); Small, 728 F.3d at 273 (concluding that prison's failure to respond to grievance excused plaintiff's failure to appeal because he had nothing to appeal from and, therefore, "the appeals process was unavailable to him"); see also DeFranco v. Miller, No. 20-cv-00368, 2023 WL 3876779, at *6 (W.D. Pa. Mar. 23, 2023) (concluding that administrative remedies under DC-ADM 804 were unavailable to plaintiff who submitted appeal of denied grievance to final review, SOIGA never received appeal due to apparent mail system issues, and SOIGA never responded to appeal), report and recommendation adopted, 2023 WL 3170400 (W.D. Pa. May 1, 2023).

Having concluded that the final appeal process was unavailable to Murdock due to SOIGA's failure to address his appeal, the next question for the Court to

consider is the effect this determination has on Murdock's claims here.  In

particular, the record before the Court shows that, inter alia, Murdock did not

submit Grievance 858386 in accordance with DC-ADM 804 because he untimely

filed it and improperly used three pages for it.[22]  These were two of the three

procedural defects the grievance officer identified in the remanded initial review

---

[22] Murdock attempts to challenge the untimeliness of his grievance by arguing that equitable tolling should apply.  (Doc. 90 at 3.)  Although at least one other circuit court has determined that equitable tolling may apply in the PLRA exhaustion context, see Wendell v. Asher, 162 F.3d 887 (5th Cir. 1998), overruled by implication on other grounds by Jones, 549 U.S. at 216, the Third Circuit Court of Appeals has not.  Even if the principle of equitable tolling did apply to the deadlines in DC-ADM 804, it would not assist Murdock here.

    Regarding applying equitable tolling, it

> is to be "applied sparingly." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002). Its use is appropriate in three principal, though non-exclusive, circumstances: "(1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff timely asserted his or her rights mistakenly in the wrong forum." Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1387 (3d Cir. 1994), abrogated on other grounds by Rotkiske v. Klemm, 890 F.3d 4[2]2, 428 (3d Cir. 2018) (en banc).

Bello v. Capital One Bank USA N.A., No. 23-2758, 2024 WL 2794418, at *3 (3d Cir. May 31, 2024) (unpublished).  Here, while Murdock claims an entitlement to equitable tolling because he withdrew Grievance 854683 out of fear for his life, the Court finds that his purported fear, which the Court determines is incredible, is, in any event, insufficient to warrant equitable tolling.  Murdock admitted that no one coerced him or caused him to withdraw his grievance, and he has not shown that this fear constitutes an "extraordinary way" in which he was prevented from asserting his rights.

response as reasons to deny Grievance 858386, and they were also the reasons the

facility manager provided for upholding the grievance denial.[23]  Ordinarily, these

procedural defects would result in the procedural default of Murdock's Section

1983 claims.  See Spada v. Martinez, 663 F. App'x 112, 114–15 (3d Cir. 2016)

(unpublished) ("Judgment in favor of Martinez on the ground that Spada

procedurally defaulted his available administrative remedies was proper because

Spada did not substantially comply with the prison grievance process, resulting in

the rejection of his grievance not on the merits but as untimely filed . . . ."); Watson

---

[23]  The Court recognizes that the third defect identified was Murdock grieving an
event that was part of Grievance 854683, which Murdock voluntarily and
knowingly withdrew.  Although this does not affect the Court's resolution of this
matter, the Court notes that third defect appears to be a questionable ground for
denying Murdock's grievance.  It essentially means that if an inmate withdraws
their grievance, they are precluded from filing another grievance relating to the
events of the withdrawn grievance.  It is unclear that there is support for this in
DC-ADM 804.
        DC-ADM 804 provides that "[a]t any point in the grievance process, the
inmate may withdraw the grievance" using the Grievance Withdrawal Form.  See
DC-ADM 804 § 1.A.25.  This form does not inform the inmate that withdrawing
the grievance precludes the inmate from raising the issue identified therein in a
future grievance.  (Defs.' Ex. 3.)  In addition, DC-ADM 804 itself does not state
that an inmate is precluded from grieving an event raised in a withdrawn
grievance.  Instead, it states that "[o]nce a grievance is withdrawn, the inmate
cannot then proceed to appeal to either the Facility Manager or Final Review."
DC-ADM 804 § 1.A.25.e.  Furthermore, only if a grievance is "addressed" will the
inmate be precluded from re-raising a claim from a prior grievance.  Id. § 1.A.15
("Any grievance issue that has been or is currently being addressed will not be re-
addressed in a subsequent grievance.").  It is unclear whether withdrawing a
grievance means that the grievance was "addressed" under DC-ADM 804.

v. Fisher, 558 F. App'x 141, 144 (3d Cir. 2014) (unpublished) ("An untimely or otherwise procedurally defective administrative grievance or appeal results in a procedural default and does not satisfy the exhaustion requirement, thereby precluding an action in federal court."). Given this determination, does the Court's conclusion that the final appeal process was unavailable to Murdock excuse his procedural default? The Court concludes that it does not.

In researching this issue, the Court could not locate an appellate or district court decision addressing the factual scenario presented here, i.e., where an inmate's initial grievance and appeal to facility manager are denied on procedural grounds but then SOIGA failed to respond to the inmate's appeal to final review, thus rendering that final review unavailable for exhaustion purposes. Nevertheless, existing precedent supports the Court's conclusion that this unavailability determination does not excuse Murdock's procedural default. In this regard, the Court's unavailability determination here relates only to "whether [Murdock] has exhausted his administrative remedies in the literal sense-whether further avenues of relief are available to him within the prison's inmate grievance process." Spruill, 372 F.3d at 232. Thus, SOIGA's failure to respond to Murdock's appeal to final review only means that Murdock "has no further administrative process available" to him. Id.

Turning to the "procedural default component," id., Murdock's procedural default is not excused because the unavailability of final review is not related to the procedural defects with Grievance 858386 identified on initial review and on appeal to the facility manager. In addition, Murdock's procedural default is not excused because this grievance was never addressed on the merits at any level of the grievance process, including the highest authority, SOIGA. See Rinaldi, 904 F.3d at 271 ("[W]here a prison disregards its own procedures and rejects an inmate's otherwise procedurally defaulted complaint on the merits, the claim is 'properly exhausted' under the PLRA."). For the Court to determine Murdock's procedural default is excused, the Court would have to either (1) conclude that SOIGA's failure to respond to Murdock's appeal equates to a decision on the merits of his grievance or (2) presume that SOIGA would have, for the first time in Murdock's grievance process, addressed his grievance on the merits. There is no legal support for the Court to do so. Accordingly, the Court concludes that Defendants have satisfied their burden to show Murdock failed to properly exhaust his administrative remedies.[24]

---

[24] Although Defendants have not raised this issue in their submission, any Section 1983 claim Murdock would have against Terra would be procedurally defaulted because Murdock failed to name him in Grievance 858386, and he is not referenced in any other document created during the processing of that grievance. See Spruill, 372 F.3d at 234 (explaining that, unless excused, prisoner plaintiff's failure to name defendant in grievance results in procedural default of Section 1983 claim against that defendant).

**D.      Conclusions of Law Relating to Administrative Exhaustion[25]**

1.      Murdock knowingly and voluntarily withdrew Grievance 854863.

2.      Murdock failed to administratively exhaust Grievance 854683.

3.      Murdock both appealed from the facility manager's upholding of the denial of his remanded grievance and supplied SOIGA with the missing documents identified in SOIGA's AR.

4.      Due to SOIGA's failure to respond to Murdock's appeal to final review, the final appellate process under DC-ADM 804 was unavailable to him.

5.      Grievance 858386 was untimely filed.

6.      Grievance 858386 was one page longer than permitted under DC-ADM 804.

7.      Murdock's claims raised in Grievance 858386 are procedurally defaulted due to his failure to file his grievance in compliance with the requirements of DC-ADM 804.

8.      The unavailability of the final appellate process under DC-ADM 804 for Murdock does not excuse Murdock's procedurally defaulted claims against Defendants.

---

[25] The Court incorporates the prior discussion relating to exhaustion in Section II.A. of this Memorandum and the analysis in Section II.C. herein.

9.     Defendants have met their burden to demonstrate Murdock failed to exhaust his administrative remedies as to the remaining Section 1983 claims against Defendants.

10.     Defendants are entitled to judgment in their favor on Murdock's remaining Section 1983 claims against them.

11.     Judgment in favor of Defendants on Murdock's remaining Section 1983 claims leaves only Murdock's claim for prospective injunctive relief under the Pennsylvania Constitution for the Court's consideration.

12.     The Court lacks an independent basis for subject-matter jurisdiction over Murdock's claim under the Pennsylvania Constitution because the parties are not completely diverse for purposes of 28 U.S.C. § 1332.

13.     The Court declines to exercise supplemental jurisdiction over Murdock's claim for prospective injunctive relief under the Pennsylvania Constitution and will dismiss this claim without prejudice to Murdock refiling it in an appropriate Pennsylvania state court.  See 28 U.S.C. § 1367(c)(3); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726–27 (1966).

An appropriate Order follows.

s/ Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge